J-S39028-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WAYNE ALLEN GRAY, JR. | : | |
| | : | |
| Appellant | : | No. 787 MDA 2022 |

Appeal from the Judgment of Sentence Entered June 30, 2021
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0001620-2018

BEFORE: PANELLA, P.J., BENDER, P.J.E., and NICHOLS, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED: MARCH 21, 2023**

Appellant, Wayne Allen Gray, Jr., appeals from the judgment of sentence of 21 to 60 years of incarceration imposed following his convictions for various crimes all relating to the physical and sexual abuse of his occasional romantic partner, Victim. We vacate judgment of sentence and remand for further proceedings.

The trial court ably summarized the facts as presented by the Commonwealth at Appellant's jury trial as follows:

> [V]ictim testified that she had a 'friends with benefits' relationship with Appellant and that, at the time, she was staying with him in his apartment located in the Borough of Chambersburg. In roughly the month leading up to July 27, 2018, Appellant had been away. On July 27, 2018, Appellant returned to town with another female, picked [V]ictim up in his car, and the three returned to the apartment and 'hung out.' After the other female left, [V]ictim and Appellant drank alcohol, smoked marijuana, and had consensual sex.

At some point afterward, Appellant began insinuating that [V]ictim had sexual relations with one of his brothers while he was away, that he was 'giving her a chance to admit to anything' she did, and that he wanted to hear it from her own mouth. The accusation was indeed true, but [V]ictim did not admit it to Appellant. Appellant told [V]ictim that he was giving her that day to tell him, or the next day there would be consequences.

The following morning, on Saturday, July 28, 2018, Appellant had left the apartment for reasons unknown to [V]ictim. She awoke to the sound of Appellant knocking on the door for her to let him in, which she did. [V]ictim testified that she was under the influence of crack cocaine and possibly marijuana at the time. While in the kitchen, Appellant punched her in the face with a closed fist, causing her to fall to the floor. Appellant was repeating over and over that [V]ictim had sex with his brother. [V]ictim testified that she was scared for her life, stating that he had previously beaten her "for a lot less."

Appellant first removed a fork from a kitchen drain-board and began scratching and stabbing [V]ictim on her face, arms, and legs. One of these injuries left a scar on her thumb. He then grabbed a butter knife and began 'jabbing' [V]ictim 'pretty much all over,' which did pierce her skin. After that, he grabbed a sharper knife and cut off part of her hair. While [V]ictim was lying on her back on the floor of the kitchen, she testified that Appellant then put his foot on her throat and began choking her to the point that she could not breathe. [V]ictim testified that she felt as though she was going to pass out and that, while she was being choked, she urinated herself [*sic*]. Appellant then became angry because [V]ictim was 'bleeding everywhere' and he told her to clean up the kitchen and take a shower.

Shortly thereafter in the living room, Appellant began striking [V]ictim hard with a wooden bat, striking her in the head, legs, and arms. Appellant then went into his bedroom, put Vaseline on the wooden bat, and asked [V]ictim, 'Where is it going?' He then instructed [V]ictim to insert the wooden bat into her rectum while she performed fellatio on him. When asked why she did not resist these attacks, [V]ictim testified that Appellant would have 'forced it and did it himself and continued to hurt me if I didn't.'

Later on in the evening, [V]ictim testified that Appellant forced her to have sexual intercourse with him in his bedroom, forcing his penis into her vagina. [V]ictim testified that she was still in

pain from the earlier attack and did not consent to the intercourse. When asked why she did not fight back or resist during either encounter, she indicated that she was afraid of him and that 'it would not have mattered' and 'he would have taken control and done it anyway.' [V]ictim further testified that Appellant kept a close eye on her, even checking on her if she was in the bathroom for too long, and that there were locks on the door which made her feel that she could not leave.

Two days later on Monday, July 30, 2018, [V]ictim accompanied Appellant's brother and another female to take Appellant to an appointment, which [V]ictim saw as an opportunity to get away. She asked Appellant's brother to take her to the house in which her mother was staying. [V]ictim's mother called 911 and [V]ictim was taken to the hospital via ambulance. When [V]ictim explained what had happened to staff there, they contacted law enforcement.

Based on [V]ictim's statements, police promptly obtained a search warrant for Appellant's apartment. The evidence collected corroborated [V]ictim's version of events. [V]ictim's blood was found throughout the apartment, including on a pair of men's size 13 shoes which the Commonwealth posited Appellant was wearing during the attack. A significant bloodstain was identified on a sofa in the living room, near a stain later identified to be Appellant's semen. A bucket containing bloody rags was located in the bathroom. A container of petroleum jelly was found in Appellant's bedroom. The wooden bat was found on the floor of the bedroom. A clump of [V]ictim's hair was found behind the toilet in the bathroom. Three utensils were found in the kitchen sink, including a fork with a bent prong and a butter knife with a bent blade, as well as a knife believed to have been used to cut [V]ictim's hair.

Several photographs of [V]ictim's injuries were admitted into evidence. [V]ictim had numerous bruises all over her body, including on her back, chest, arms, neck, and face. [V]ictim also had a bruise on her arm consistent with a fork. The police officer who first interacted with [V]ictim testified that she had bruises on her legs and one of her ears, as well as on her chest. A CAT scan revealed bleeding on [V]ictim's brain. The sexual assault nurse examiner who examined [V]ictim observed that she had two tears measuring 5 millimeters in length within the labia minora, which the nurse testified is usually associated with a degree of force.

A sexual assault kit was used to collect samples from [V]ictim[] and was sent for forensic analysis, along with other samples collected from the apartment. The report for these samples was admitted into evidence, and a forensic DNA scientist testified to its findings and accuracy. Forensic testing discovered [V]ictim's DNA on the wide-end of the bat. All of the blood samples, including the blood on the shoes, walls, and sofa – also matched [V]ictim. Appellant's sperm was identified from the swab taken from [V]ictim's vagina.

Trial Court Opinion, 2/3/22, at 2-6 (footnotes omitted) (hereinafter "TCO").[1]

Appellant was sentenced on June 30, 2021. Appellant chose to represent himself at that proceeding and later filed an untimely, *pro se* post-sentence motion on July 16, 2021, which raised numerous claims, including ineffective assistance of counsel. The post-conviction court construed the motion as a request for relief under the Post-Conviction Relief Act ("PCRA"),[2] and appointed counsel to represent Appellant. Counsel filed a motion requesting that the trial court treat the post-sentence motion as timely due to application of the prisoner mailbox rule, and represented that Appellant stamped his post-sentence motion on July 1, 2021. The trial court granted this request and deemed the post-sentence motion timely. The post-sentence motion was denied by operation of law on November 17, 2021, but no order was entered. Appellant filed a protective notice of appeal on December 10,

---

[1] The trial court explained in a footnote that the "wooden bat" was "described in a variety of ways throughout trial" and was admitted into evidence. TCO at 4 n.26. The court stated that the bat "is certainly not appropriately described as a 'baseball bat'" and explained that it is similar to a dowel rod. For the sake of continuity, the trial court referred to the item as a "bat" and we shall do the same.

[2] 42 Pa.C.S. §§ 9541-9546.

2021, docketed at 1628 MDA 2022. The trial court ordered Appellant to file a concise statement of matters complained of on appeal on December 14, 2021.

During the pendency of that appeal, Appellant filed a second post-sentence motion on February 25, 2022, arguing that the Commonwealth had promised Victim leniency regarding her own outstanding charges in exchange for her testimony against Appellant. *See* Pa.R.Crim.P. 720(C) ("A post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery."). Appellant also requested a remand from this Court to address the motion, as approved by the Rule's comment. *Comment* to Rule 720 ("[A]fter-discovered evidence discovered during the post-sentence stage must be raised promptly with the trial judge at the post-sentence stage; after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the trial judge[.]").

This Court quashed the appeal and denied the request for remand as moot. *See* Order at 1628 MDA 2022, 3/9/22. Our order explained that this Court had previously issued a rule to show cause why the appeal should not be quashed, as the docket reflected that no order had been entered denying the post-sentence motion by law. Appellant supplied this Court with proof that he filed a praecipe for entry of an order denying the post-sentence motion by law on February 7, 2022. However, as of March 9, 2022, the docket did not show that an order denying the post-sentence motion had been entered.

We thus instructed the trial court to issue separate orders addressing Appellant's post-sentence motion for a new trial and his original post-sentence motion. We also deemed the request to remand as moot. The trial court thereafter entered separate orders on May 3, 2022.

Appellant filed a notice of appeal. *See* Notice of Appeal, 5/20/22, at 1 (single page filing) ("Notice is hereby given that [Appellant] … hereby appeals … from the Opinion and Order of Court denying [Appellant]'s Post-Sentence Motion dated May 3rd, 2022.").[3] Appellant raises the following issues for our review:

---

[3] We conclude that the separate post-sentence motion based on the after-discovered evidence claim was incorporated into the judgment of sentence as made final by the denial of Appellant's original post-sentence motion. *See Commonwealth v. Beeman*, 847 A.2d 87, 87 n.1 (Pa. Super. 2004) ("[A]ppeal properly lies from the judgment of sentence made final by the denial of post-sentence motions[.]") (citation omitted).

As the Comment to the Rule reflects, a claim for after-discovered evidence discovered during the post-sentence motion stage is properly before the trial court in the first instance, whereas remand is required when this Court has jurisdiction during the direct appeal process. A breakdown in the process occurred when the clerk of courts failed to deny Appellant's original post-sentence motion by operation of law. *See Commonwealth v. Khalil*, 806 A.2d 415, 420 (Pa. Super. 2002) (stating that "failure of the clerk of courts to issue an order ... deeming the [a]ppellant's post-sentence motions denied by operation of law, was a breakdown of the processes of the trial court"). Thus, we could have treated the original appeal as timely based on that breakdown. However, we would then be forced to remand to address the newly-discovered evidence claim.

In effect, until now, this Court had not decided whether the Rule 720(C) motion was filed during the normal post-sentence motion period or whether it was filed during the "direct appeal process." Due to the combination of our

*(Footnote Continued Next Page)*

- 6 -

1. Whether the [t]rial [c]ourt erred in denying [Appellant]'s request for a new trial based upon the Commonwealth's failure to disclose that [Victim] … would receive a plea bargain in consideration of her testimony against [Appellant][.]

2. Whether the [t]rial [c]ourt erred in denying [Appellant]'s Pretrial Motion to Suppress Evidence due to an illegal search of a premises not referenced in the application for search warrant[.]

3. Whether the [t]rial [c]ourt erred in denying [Appellant]'s Pretrial Motion to Suppress Evidence due to certain evidence not described in the search warrant being seized without authority[.]

4. Whether the [t]rial [c]ourt erred in allowing Nurse Nancy Bates to testify to statements of [V]ictim in violation of the rules of evidence prohibiting hearsay[.]

5. Whether the evidence was sufficient to convict [Appellant] of Involuntary Deviate Sexual Intercourse [("IDSI")] when the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] engaged in sexual intercourse through force or threat of force[.]

6. Whether the evidence was sufficient to convict [Appellant] of Rape when the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] engaged in sexual intercourse through force or threat of force[.]

7. Whether the evidence was sufficient to convict [Appellant] of Strangulation when the Commonwealth failed to prove beyond a reasonable doubt that it was [Appellant]'s conscious object or purpose to restrict the breathing or the circulation of the blood of [V]ictim[.]

8. Whether the evidence was sufficient to convict [Appellant] of Aggravated Assault with a Deadly Weapon when the Commonwealth failed to prove beyond a reasonable doubt that [Appellant] used a device or instrumentality calculated or likely to produce death or serious bodily injury[.]

---

quashal, which served to terminate the direct appeal process, and the breakdown in the administrative process that led to that quashal, we opt to treat Appellant's post-sentence motion based on after-discovered evidence as if it were filed during the post-sentence motion period.

9. Whether the [t]rial [c]ourt erred in sentencing [Appellant] to consecutive sentences for Rape and [IDSI] when these two counts should have merged for sentencing purposes[.]

10.Whether the [t]rial [c]ourt's imposition of consecutive aggravated range sentences, rather than concurrent sentences[,] is unduly harsh, considering the nature of the crimes and the length of imprisonment[.]

Appellant's Brief at 4-6.

Appellant's first claim involves Victim's guilty plea on May 27, 2021, to two cases that were outstanding at the time of Appellant's trial. The jury was informed that Victim was facing criminal charges. The Commonwealth asked, "Have you been, I guess, promised anything or paid at all for your testimony here?" Victim replied, "No." N.T., 4/25/21, at 70. Appellant filed the post-sentence motion after obtaining Victim's plea transcript. The transcript shows that the Commonwealth, represented by the same assistant district attorney who prosecuted Appellant, amended Victim's felony criminal trespass charge to a misdemeanor theft, and amended a felony escape charge to a misdemeanor disorderly conduct. Appellant sought a new trial on the basis that the Commonwealth must have agreed to the reduced charges in exchange for Victim's testimony against Appellant. Appellant cited the prosecutor's statement at the plea that Victim was cooperative and provided testimony against Appellant. The Commonwealth filed a response to the motion, arguing that her testimony was only a factor in the plea bargain. Appellant maintains that he is entitled to a new trial.

> Exculpatory evidence favorable to the accused is not confined to evidence that reflects upon the culpability of the defendant. Exculpatory evidence also includes evidence of an impeachment

- 8 -

nature that is material to the case against the accused. ***Napue v. Illinois***, 360 U.S. 264 … (1959). As the court in ***Napue*** sagely observed: "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying that a defendant's life or liberty may depend." ***Id.*** at 269[.] Any implication, promise or understanding that the government would extend leniency in exchange for a witness'[s] testimony is relevant to the witness'[s] credibility. ***United States v. Giglio***, 405 U.S. 150 … (1972)…. [W]hen the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted. ***United States v. Bagley***, 473 U.S. 667 … (1985).

***Commonwealth v. Strong***, 761 A.2d 1167, 1171 (Pa. 2000).

The trial court did not hold a hearing on the matter. Instead, the court concluded that Appellant failed to establish that a plea agreement existed, as the Commonwealth's response cited several explanations for the plea which the trial court credited. The trial court declined to determine whether Appellant would be entitled to a new trial if a plea deal existed, but expressed skepticism based on the overwhelming evidence of guilt.

The Commonwealth continues to maintain that there was no plea deal. The Commonwealth also states, "Because the trial court denied Appellant's post-sentence motions without a hearing, the Commonwealth did not have the opportunity to create a record detailing the process it underwent when crafting the plea agreement in [Victim]'s criminal case." Commonwealth's Brief at 9. The Commonwealth cites the witnesses and facts it would have introduced at a hearing, all of which it submits would have established that there was no plea agreement made in exchange for Victim's testimony.

Alternatively, the Commonwealth argues that "any such error was harmless because there is no reasonable probability that had the jury been made aware of the plea agreement between Victim and the Commonwealth, that the outcome of the trial would have been different." *Id.* at 10. Still, the Commonwealth "concedes that a remand for the limited purposes of holding an evidentiary hearing to establish a record … may be necessary." *Id.* at 11.

We accept the Commonwealth's willingness to place these matters on the record. While we agree that the evidence of guilt appears to be overwhelming, we recognize that prosecutors "have a unique role in our criminal justice system." *See Commonwealth v. Chmiel*, 173 A.3d 617, 631 (Pa. 2017) (Donohue, J., concurring). The Commonwealth is required to seek justice, not win cases. *Id.* We are not inclined to simply conclude that any such deal, if it existed, was ultimately irrelevant. Indeed, the Commonwealth concedes that a limited remand is warranted. We therefore find that the trial court abused its discretion in concluding that no plea agreement existed without sufficient record support.

Accordingly, we shall vacate the judgment of sentence and remand for the limited purpose of an evidentiary hearing on this issue. If the court concludes after this hearing that Appellant has failed to establish that an agreement was in place at the time of trial for a plea bargain in exchange for Victim's testimony, or it concludes that Appellant cannot establish a reasonable probability that the outcome of trial would have been different if

any such agreement existed, then the court shall reimpose the judgment of sentence.

Because the court is instructed to reinstate the judgment of sentence if it concludes that Appellant is not entitled to a new trial following an evidentiary hearing, we now address Appellant's remaining claims.[4]  Appellant's second and third issues both involve the search warrant for his residence.

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*.  Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted.  Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citations omitted).

Appellant first attacks the sufficiency of the description in the search warrant regarding the place to be searched.  The search warrant authorized a search of the following premises:

> 321 Lincoln Way West, second floor apartment is the target of the search.  321 Lincoln Way West is attached to 319 Lincoln Way West.  321 Lincoln Way West is a brick house with a first floor and second floor apartment.  321 Lincoln Way West has white trim windows.  The entry into the second floor apartment is on the west

_____

[4] Additionally, Appellant would be entitled to discharge if the evidence were insufficient to convict, thus eliminating the possibility of a new trial on some or all of the counts.

- 11 -

side of the building with a set of stones stairs that leads to a landing/ porch. The landing has [a] white railing and white posts.

Appellant's Brief at 12 (citation omitted).

Appellant argues that the "Commonwealth searched the wrong property." *Id.* at 13. Appellant appears to claim that the Commonwealth searched the "wrong" property in that 321 Lincoln Way West does not really exist. The basis for that assertion is the rental agent's description for the second-floor apartment, which described it as 321½ Lincoln Way West. "The police officer … referenced in his testimony that he knew that the agent that rented the property specifically referred to the property by a different address, 321½ Lincoln Way West, not 321 Lincoln Way West, Second Floor." *Id.* Appellant states that the officer "was quite aware of the discrepancy" and was thus required to "specifically reference both addresses." *Id.*

We disagree. "[T]he Supreme Court has held a 'practical, common-sense' approach should be taken in determining whether the place to be searched is specified with sufficient particularity." *Commonwealth v. Irvin*, 134 A.3d 67, 73 (Pa. Super. 2016). Where the structure contains multiple living units, it generally suffices that the warrant singles out a particular unit. *See In Int. of Wilks*, 613 A.2d 577, 579 (Pa. Super. 1992) ("A search warrant directed against an apartment house, or other multiple-occupancy structure will be held invalid for lack of specificity if it fails to describe the particular room or subunit to be searched with sufficient definiteness to preclude a search of other units."). Detective Todd Harden, who testified at the evidentiary hearing, verified Appellant's address through the Borough of

Chambersburg's utility service records and used that address on the warrant application. That address, in combination with the description, which specifically referenced the stairs leading to the porch of the subunit, leaves no doubt that the second-floor apartment was to be searched to the exclusion of the first-floor apartment.

Even if we accepted that how the rental agent chose to describe the building was relevant, it is not clear what the "½" designation referred to. Appellant offers no support for the proposition that a search warrant must include all possible designations. Moreover, using the rental agent's description would itself cause confusion. If the ½ simply conveys that the two-unit structure was split into equal halves, then specifying "321½ Lincoln Way West" would probably invalidate the search warrant under the foregoing principle as it would be unclear which half was the target of the search. No relief is due.

Appellant's third issue relates to items that were seized outside the scope of the warrant. The search warrant authorized the officers to seize the following items: a wooden baseball bat, dining style four prong fork, blood, and Victim's cut hair. The receipt of the items that the authorities seized included a pair of Nike Zoom shoes, a silver butter knife, a silver blade knife with a black handle, and a cotton swab that officers used to collect suspected semen. Appellant argues that these items do not fall within any of the items referenced in the warrant and that no exception to the warrant requirement applies. The Commonwealth agrees that the knives and semen sample are

not within the scope of the warrant but submits that these items were lawfully seized pursuant to the plain view exception. As to the shoes, the Commonwealth argues that the seizure was justified to test the shoes for blood, which was an item listed on the warrant.

Beginning with the shoes, we agree that the suspected presence of blood on the shoes justified their seizure. The warrant authorized the seizure of blood, and thus the authorities could seize items with suspected blood for further testing. The search team found dried blood in numerous places throughout the apartment, including on the shoes. Thus, the shoes, which contained the blood, were lawfully seized.

As to the remaining items, we agree that the officers properly seized the items under the plain view exception to the warrant requirement:

> This doctrine permits a valid warrantless seizure of an item where: (1) the police have not violated the Fourth Amendment in arriving at the location from which the item could be viewed; (2) the item is in plain view; (3) the incriminating character of the item is immediately apparent; and (4) the police have a lawful right of access to the item itself. *Horton v. California*, 496 U.S. 128, 133 … (1990).

*Commonwealth v. Jones*, 988 A.2d 649, 656 (Pa. 2010) (footnote and some citations omitted).

There is no question that the first prong is met as the police searched the home pursuant to a valid search warrant. As to the second, Appellant does not claim that the items were not in plain view. His argument centers on the remaining two prongs. *See* Appellant's Brief at 10 ("Additionally[,] the incriminating character of the items must be readily apparent, which is lacking

- 14 -

in this case. Clearly there were no exigent circumstances as law enforcement had secured the premises to conduct the search.").

We disagree. Beginning with the third prong, the incriminating character of the items was readily apparent to the investigating officers based on their evidentiary value. At the evidentiary hearing on Appellant's motion to suppress, the Commonwealth asked Detective Harden, "Item number 4, silver colored butter knife. Why … was that item seized?" N.T. Suppression, 1/3/19, at 16-17. Detective Harden replied, "During the interview with [Victim], she explained that [Appellant] attempted to utilize a butter knife for cutting her hair before [Appellant] used a black handled knife from the kitchen to actually cut her hair." *Id.* at 17. Detective Harden stated that he seized the items for their evidentiary value. *Id.* As to the lawful right of access, under these facts the warrant's authorization to search supplied the lawful right of access.

The *Horton* case, cited by *Jones, supra*, is instructive on these points. There, police were investigating an armed robbery and established probable cause to search Horton's home for weapons used by the perpetrators as well as proceeds from the robbery. The magistrate authorized a search for the proceeds, albeit limited to three specifically described rings. The magistrate did not authorize a search for weapons.

Officers searched Horton's home but did not find the stolen property. While searching for the rings, an officer discovered, in plain view, several firearms. The officer conceded in his testimony that, while searching for the

rings, he was interested in finding other items connecting Horton to the robberies. The **Horton** Court rejected the notion that the plain view exception only applies when the authorities inadvertently come across the items. The Court's reasons for rejecting that theory are relevant to our analysis of Appellant's claim. Specifically, Detective Harden testified that he knew the knives were incriminating because of what Victim told him about the attacks. Yet, the search warrant, while listing Victim's hair as an object of the search, did not, for whatever reason, list the items used to cut Victim's hair. The **Horton** Court addressed this scenario:

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement. If the officer has knowledge approaching certainty that the item will be found, we see no reason why he or she would deliberately omit a particular description of the item to be seized from the application for a search warrant. Specification of the additional item could only permit the officer to expand the scope of the search. On the other hand, if he or she has a valid warrant to search for one item and merely a suspicion concerning the second, whether or not it amounts to probable cause, we fail to see why that suspicion should immunize the second item from seizure if it is found during a lawful search for the first. The hypothetical case put by Justice W[hite] in his concurring and dissenting opinion in **Coolidge v. New Hampshire**, 403 U.S. 443, 516 (1971), is instructive:
>
> > "Let us suppose officers secure a warrant to search a house for a rifle. While staying well within the range of a rifle search, they discover two photographs of the murder victim, both in plain sight in the bedroom. Assume also that the discovery of the one photograph was inadvertent but finding the other was anticipated. The Court would permit the seizure of only one of the photographs. But in terms of the 'minor' peril to Fourth Amendment values there is surely no

difference between these two photographs: the interference with possession is the same in each case and the officers' appraisal of the photograph they expected to see is no less reliable than their judgment about the other. And in both situations the actual inconvenience and danger to evidence remain identical if the officers must depart and secure a warrant."

*Id.*[] at 516.

*Horton*, 496 U.S. at 138-39.

That hypothetical largely applies to these facts. The officers presumably expected, or at least suspected, that they would find the knives. However, Appellant does not argue that the officers' authority to search the premises was terminated prior to finding the knives and suspected semen. As stated in *Horton*:

In this case, the scope of the search was not enlarged in the slightest by the omission of any reference to the weapons in the warrant. Indeed, if the three rings and other items named in the warrant had been found at the outset—or if petitioner had them in his possession and had responded to the warrant by producing them immediately—no search for weapons could have taken place.

*Id.* at 141.

The same is true here. Thus, whether the authorities mistakenly failed to request to search for the knives and semen, or believed that they did not have probable cause that those items would be found in the home, the point remains that the officers observed the recovered items in plain view during a search for items they were authorized to recover. Accordingly, the scope of this search was not broadened by the failure to include the knives and semen

in the warrant, and their evidentiary nature was immediately apparent to Detective Harden.[5]

Appellant's fourth issue concerns the admission of hearsay statements relayed by Victim to a nurse. Victim was examined by Nancy Bates, a sexual assault nurse examiner. During Nurse Bates' testimony, she referenced the following conversation with Victim.

> [Victim] said that she was homeless[,] and she was an addict and that she had been living with [Appellant].
>
> [Victim] said that she was in the home[,] and [Appellant] left to talk with someone by the name of Theresa McGinley[,] and that Ms. McGinley told [Appellant] that [Victim] had had sex with her brother [*sic*]…. [Victim] said that [Appellant] had told her in the past that he would kill her if she messed with his brothers.
>
> After talking with Ms. McGinley, [Appellant] returned to the house where … [V]ictim was and beat her up. She said that she was … beaten with a bat and hit in the head, arms, legs, and she thought maybe her ribs.
>
> She also reported being stabbed and scraped with a fork and a butter knife[,] and she had multiple puncture wounds that were visible. She also had abrasions on her face, arm, and legs[,] and she said that she had been living with [Appellant] since December 2017….
>
> She states that [Appellant] would withhold drugs from her if she didn't do what he wanted her to do[,] and she stated that's she [*sic*] really afraid of what he will do. She stated that [Appellant] had threatened to harm her sister and her mother if she didn't do what he wanted her to do.

N.T., 4/5/2021, at 141-42.

---

[5] We note that the Pennsylvania Constitution rejects the "good faith" exception to the exclusionary rule. Plain view, however, is an exception to the warrant requirement and does not involve the exclusionary rule.

Appellant submits that this evidence was not admissible under any hearsay exception and therefore we must assess whether its admission was harmless. The Commonwealth does not address whether the evidence was properly admitted and/or whether it was harmless. The Commonwealth instead maintains that Appellant failed to preserve this issue.

We agree with the Commonwealth. The challenged testimony contains hearsay, double hearsay, and triple hearsay. The first level of hearsay is the statements by Victim to Nurse Bates. The double hearsay consists of what Ms. McGinley told Victim, which was then related by Victim to Nurse Bates at the first level of hearsay. The third level of hearsay consists of what Appellant told Ms. McGinley, which in turn was related to Victim and up the chain through the levels of hearsay as described. While Appellant's statements to Ms. McGinley would be admissible as an admission had Ms. McGinley testified, Appellant is correct that the statements of Ms. McGinley relating those admissions to Victim (and consequently the Victim's relating that hearsay to Nurse Bates) must be separately admissible.

Turning to issue preservation, Appellant lodged an objected when the Commonwealth asked Nurse Bates, "And what did [Victim] tell you occurred?" The Commonwealth responded, "I believe this is a statement for purposes of medical treatment or diagnosis that has comes [*sic*] into direct contradiction by [Appellant]. They have brought this up by witnesses on the witness stand." N.T., 4/5/21, at 139. Appellant replied that he was not sure what the prosecution was referencing. The Commonwealth stated, "[Appellant]

- 19 -

indicated with regard to whether or not [Victim] had used controlled substances on the date that she reported[,] and he cited to the medical records indicating as such. [T]hese are statements for purposes of medical treatment and diagnosis. They are admissible on that basis alone." *Id.* at 139-40. The trial court overruled the objection.

We agree with the trial court and Commonwealth that the objection was properly overruled at the outset, as the prosecution indicated that Nurse Bates would provide answers relevant to the hearsay exception for medical treatment and diagnosis. Our Supreme Court has explained the rationale for this exception, as well as its limits, as follows:

> The common law traditionally excluded statements to physicians as to the cause of an injury (in contrast to statements of symptoms and sensations) from coming in as substantive evidence. *See Joseph, Evidence in America*, Rule 803 at p. 57 (1994)("Statements of cause were excluded as inherently unreliable."). *See, e.g.*, *Cody v. S.K.F.*, … 291 A.2d [772,] 776 (Pa. 1972) ("statements which related to the cause of the injury were not admissible unless they were part of the *res gestae* [*i.e.*, excited utterance].") Prior to *Cody*, testimony repeating statements made by patients concerning the cause of the injury were not admissible as substantive evidence. However, *Cody* expanded the law and permitted such testimony regarding the cause of the injury. The law was again extended in *Commonwealth v. Blackwell*, … 494 A.2d 426 (Pa. Super. 1985), to include testimony repeating statements made to nurses for the purposes of medical treatment and diagnosis.
>
> The second requirement for a statement to come within the medical treatment exception is that the statement be pertinent to medical treatment. By way of example, a person's statement, "I was hit by a car," made for the purpose of receiving medical treatment would come within the exception. It is important for doctors to know how the person sustained the injuries. However, a person's statement, "I was hit by the car which went through

the red light," would not come within the exception, or at least that part of the statement which indicated that the car "went through the red light" would not. It is inconsequential and irrelevant to medical treatment to know that the car went through the red light.

*Commonwealth v. Smith*, 681 A.2d 1288, 1291–92 (Pa. 1996) (some citations omitted).

The trial court concluded that many of the statements plainly exceeded the medical treatment exception but opined that Appellant's claim was waived due to the failure to object once Nurse Bates' testimony went afield of the medical treatment exception. We agree. Appellant was required to make a further objection once Nurse Bates' testimony strayed from the bounds of the medical treatment exception. We therefore find that the issue has been waived.

Appellant's fifth, sixth, seventh, and eighth issues all concern the sufficiency of the evidence to convict. The legal principles applicable to all four issues are identical:

Whether sufficient evidence exists to support the verdict is a question of law; our standard of review is *de novo* and our scope of review is plenary. We review the evidence in the light most favorable to the verdict winner to determine whether there is sufficient evidence to allow the [fact-finder] to find every element of a crime beyond a reasonable doubt.

*Commonwealth v. Tejada*, 107 A.3d 788, 792 (Pa. Super. 2015) (citations and quotation marks omitted). As this case centers on the credibility of Victim, we add that "It is well-established that a victim's testimony alone can be sufficient to sustain a conviction." *Commonwealth v. Johnson*, 180 A.3d

- 21 -

474, 479 (Pa. Super. 2018). "[A] solitary witness's testimony may establish every element of a crime, assuming that it speaks to each element, directly and/or by rational inference." *Id.* (italics omitted).

Appellant argues his fifth issue, concerning his conviction for IDSI, together with his sixth issue, concerning his conviction for rape, as both crimes involve the common element of "forcible compulsion." Regarding IDSI, Appellant was charged with violating 18 Pa.C.S. § 3123(a)(1), which applies to "engag[ing] in deviate sexual intercourse with a complainant … by forcible compulsion." Appellant does not assail the deviate sexual intercourse component and instead focuses on a purported absence of forcible compulsion. As to rape, Appellant was charged with one count of violating 18 Pa.C.S. § 3123(a)(1), which prohibits "sexual intercourse with a complainant … [b]y forcible compulsion." Appellant argues that the evidence for "forcible compulsion" is lacking, as Victim testified, "I don't know if I used the word [']no['] but he knew that I didn't want to." Appellant's Brief at 20 (quoting N.T., 4/5/21, at 104). Additionally, Victim testified that Appellant knew she would not want to have sex because "she didn't make advances toward him," *id*. (quoting N.T., 4/25/21, at 121), and thus only her demeanor conveyed that she did not wish to have sex. Moreover, the two had a "friends with benefits" relationship and had consensual sex before the abuse commenced. According to Appellant, "[a]t best there may have been a mere showing of a lack of consent, which is insufficient to sustain the element of forcible compulsion." *Id.* at 21.

In assessing whether "forcible compulsion" exists, fact-finders are entitled to consider the context surrounding the encounter. In *Commonwealth v. Fears*, 836 A.2d 52 (Pa. 2003), the appellant argued that there was no factual basis for his plea to IDSI as forcible compulsion was not established. The appellant argued that the prosecutor's factual summary established only that the victim "did not respond to this particular act [the oral sodomy] with resistance." *Id.* at 66 bracketing in original).[6] As such, the appellant claimed that there was no factual basis to support forcible compulsion.

Our Supreme Court disagreed, relying in large part on *Commonwealth v. Rhodes*, 510 A.2d 1217 (Pa. 1986), which examined the sufficiency of evidence to support the element of forcible compulsion where a twenty-year-old defendant performed sexual acts on an eight-year-old girl after luring her into a building and instructing her to lie on the ground. The Superior Court had reversed the rape conviction on the basis that no force was used. The *Rhodes* Court reversed, explaining that "forcible compulsion" includes "not only physical force or violence but also moral, psychological, or intellectual force used to compel a person to engage in sexual intercourse against that person's will." *Id.* at 1226. The *Rhodes* scenario was inherently one that would prevent resistance because the child was younger, smaller, and less

---

[6] As the *Fears* Court noted in a footnote, the Commonwealth proceeded on a Section 3123(a)(1) charge even though the victim was under thirteen years of age.

mature. "In such cases, forcible compulsion or the threat of forcible compulsion derives from the respective capacities of the child and the adult … without the use of physical force or violence or the explicit threat of physical force or violence." *Id.* at 1227. The same was true in *Fears*, as the appellant confessed to telling his twelve-year-old victim to "stand up and [Fears] pulled down his underwear and started to have oral sex with him." *Fears,* 836 A.2d at 66-67 (quoting plea transcript). The incident took place "[at] dusk[,] and [Fears] and the victim were in a secluded river location." *Id.* at 67.

The logic of *Rhodes* and *Fears* applies here. A rational fact-finder could conclude that Victim could either submit to Appellant's sexual demands or risk further violence. The context of Appellant's crime demonstrates that "no" was an unacceptable answer. The first attack began when Appellant confronted Victim about having sex with Appellant's brother. He brutally attacked her, causing her to bleed on multiple surfaces within the apartment. He forced Victim to take a shower and shortly thereafter began striking her with the wooden bat. Appellant put Vaseline on the bat and ordered her to insert it into her rectum. This evidence is plainly sufficient to conclude that the Victim, who was isolated from the outside world, had the choice of complying with Appellant's demands or risk further beatings. The same is true of the later rape, when Appellant inserted his penis into Victim's vagina.

The seventh issue asks whether the Commonwealth presented sufficient evidence to sustain strangulation. Pursuant to 18 Pa.C.S. § 2718(a), to be found guilty of strangulation, the Commonwealth must establish that the

person "knowingly or intentionally impedes the breathing or circulation of the blood of another by person by … applying pressure to the throat or neck[.]" 18 Pa.C.S. § 2718(a)(1).

We conclude that the Commonwealth presented sufficient evidence to support strangulation. It is axiomatic that "intent may be established by circumstantial evidence since there is rarely any direct evidence of one's subjective state of mind." *Commonwealth v. Utter*, 421 A.2d 339, 341 (Pa. Super. 1980). The jury was entitled to rationally infer that Appellant's conduct was designed to impede Victim's breathing. Victim testified that she was on her back after Appellant attacked her with the fork and knife. Afterwards, Appellant "put his foot on my throat and applied enough pleasure [*sic*] so I couldn't breathe." N.T., 4/5/21, at 56. Appellant applied enough pressure that Victim said she felt like she would pass out and ended up urinating on herself. *Id.* at 57. The circumstantial evidence suffices to justify the inference that Appellant's intent in applying pressure to Victim's throat was to impede her breathing.

Appellant's argument to the contrary rests on his cross-examination, wherein Victim agreed that "it might have been hands and feet" that Appellant used to strangle Victim, whereas in earlier testimony at a bail hearing and in police interviews, she did not mention his feet. N.T., 4/5/21, at 113. *See* Appellant's Brief at 22 (arguing that if "[Victim] herself was unsure of Appellant's actions, she could not be sure of his intentions. [V]ictim testified throughout trial that she was a regular user of drugs and was under the

- 25 -

influence during this event."). At most, Victim's testimony created a credibility issue, which the jury was entitled to resolve as they saw fit. ***Commonwealth v. Cahill***, 95 A.3d 298, 300 (Pa. Super. 2014) ("Finally, the [fact-finder,] while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part] or none of the evidence.") (bracketing in original).

Appellant argues in his eighth claim that the conviction for aggravated assault with a deadly weapon must be discharged. The statutory language for that crime states, "A person is guilty of aggravated assault if he … attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon." 18 Pa.C.S. § 2702(a)(4). "Deadly weapon" is defined to include, *inter alia*, any "device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S. § 2301.

Appellant argues that the Commonwealth failed to establish he used a deadly weapon as "the record is devoid of any evidence that [V]ictim suffered bodily injury due to the use of a weapon." Appellant's Brief at 23. The trial court opinion aptly explains why Appellant's argument fails:

> Although the wooden bat is no Louisville Slugger, it is unquestionably capable of producing death or serious bodily injury. Measuring just under two feet in length, the wooden bat would make a sturdy weapon much akin to a fireplace poker or tire iron – items that easily lend themselves to being weapons if the wielder chose to use them as such. That is how Appellant used the wooden bat, striking [V]ictim repeatedly leaving welts

and bruises all over her back and causing bleeding on the brain. Under the applicable legal standard, we find that the Commonwealth presented sufficient evidence[.]

TCO at 16-17. We fully agree. Appellant's claim fails.

Appellant's final issue challenges the discretionary aspects of his sentence.[7] These appeals are not as of right and an appellant must satisfy a four-part test to invoke our jurisdiction. **Commonwealth v. Buterbaugh**, 91 A.3d 1247, 1265 (Pa. Super. 2014).

> An appellant has sufficiently complied with the four-part test when:
>
> > (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post[-]sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.
>
> **Commonwealth v. Baker**, 72 A.3d 652, 662 (Pa. Super. 2013) (citation omitted). To present a substantial question, an appellant must set "forth a plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of the sentencing process." **Commonwealth v. Dodge**, 77 A.3d 1263, 1268 (Pa. Super. 2013) (citations omitted).

**Commonwealth v. Fuentes**, 272 A.3d 511, 519–20 (Pa. Super. 2022).

Appellant satisfied the first, second, and third conditions. However, we find that Appellant has failed to establish a substantial question. Appellant's

_____

[7] Appellant has abandoned his ninth issue, which asked whether the convictions for rape and IDSI merge. He concludes that, under the circumstances, they do not. As this issue relates to the legality of his sentence, we add that we agree with the trial court that the sentences do not merge because the crimes arise from distinct acts.

statement merely states: "The imposition of consecutive sentences … is, on its face, so disproportionate as to implicate the 'fundamental norms which underlie the sentencing process.'" Appellant's Brief at 24 (citing 42 Pa.C.S. § 9711(c)).

This is a wholly conclusory statement that does not set forth any type of plausible argument that the sentence violated the fundamental norms of the sentencing process. Appellant's complaint is merely that the consecutive sentences are unwarranted under the circumstances of the case. We disagree. Appellant forced Victim to sodomize herself with a wooden bat, raped her, and beat her so severely that a CAT scan showed signs of bleeding on Victim's brain. The aggregate sentence is lengthy, but by no means unduly harsh in light of the horrific abuse Appellant inflicted upon Victim.

Had Appellant set forth a plausible argument to warrant merits review, we would discern no abuse of discretion. Appellant merely relitigates his complaints that Victim's testimony was insufficient. He argues that the sentence is excessive "considering Appellant's age and the facts of this case. Appellant is 41 years of age. The parties were in a sexual relationship, [and] even if Appellant assaulted [V]ictim, there was no evidence presented that Appellant forced [V]ictim to later engage in sex." Appellant's Brief at 25. To the contrary, the evidence when viewed in the light most favorable to the Commonwealth, amply demonstrates that Appellant not only forced Victim to engage in sexual acts, he also brutally assaulted her over several days.

Appellant's additional claim that the court failed to consider his rehabilitative needs fails to account for the countervailing facts, which the trial court was required to consider in fashioning a proper sentence. As the trial court stated at sentencing, Appellant had been released from incarceration three days before his attacks on Victim began. N.T. Sentencing, 6/30/21, at 25. The court also cited Appellant's comments at sentencing that his own mother had been addicted to drugs. Referencing Victim, Appellant stated, "At no point do I want to harm anyone or take advantage of someone who was exactly like my mom, but if that's the way she feels and whatever reason she needed to do this, I understand and, you know, I wish you the best life." *Id.* at 22-23. The court quite reasonably concluded that Appellant was "blaming her. It's like she's doing this to you when you are the one that did these things to her." *Id.* at 27. Considering Appellant's lack of remorse, his blaming Victim, the severity of these crimes, and the fact that Appellant committed these crimes almost immediately after being released from incarceration, it is hardly surprising that the trial court determined that a lengthy sentence was needed. We would observe no abuse of discretion in this sentence.

Judgment of sentence vacated. Case remanded with instructions to hold evidentiary hearing consistent with this memorandum. Jurisdiction relinquished.

President Judge Panella joins this Memorandum.

Judge Nichols concurs in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/21/2023